UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 12- Civ-20700-COOKE/TORRES

ANTHONY RODRIGUEZ,

    Plaintiff,

vs.

CITY OF DORAL, and
JUAN CARLOS BERMUDEZ,

    Defendants.

_____/

## ORDER DENYING DEFENDANT JUAN CARLOS BERMUDEZ'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before me upon Defendant Juan Carlos Bermudez's Supplemental Memorandum in Support of His Motion for Summary Judgment ("Supplemental Memo") (ECF No. 142). On April 4, 2014, I entered an Order Granting Defendants City of Doral's and Juan Carlos Bermudez's Motions for Summary Judgment ("Initial Order") (ECF No. 116), which Plaintiff Anthony Rodriguez ("Plaintiff" or "Rodriguez") appealed. The Eleventh Circuit issued an opinion on July 19, 2017 and a mandate on August 22, 2017, which vacated the Initial Order and remanded the case. After I reopened this case, Defendant Bermudez requested leave to file a supplemental memorandum to his motion for summary judgment to address intervening case law on qualified immunity in First Amendment cases since my Initial Order—specifically *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). The instant Supplemental Memo followed, to which Plaintiff filed a Response (ECF No. 144). On January 24, 2018, Defendant Bermudez filed a Notice of Supplemental Authority (ECF No. 160), directing the Court's attention to the very recent Supreme Court case of *District of Columbia v. Wesby*, No. 15-1485, 583 U.S. __ (2018). Plaintiff filed a Response to the Notice (ECF No. 161), to which Defendant Bermudez filed a Reply (ECF No. 162). After careful review of Defendant Bermudez's Supplemental Memo and Notice of Supplemental Authority, Plaintiff's

1

Responses, and the relevant legal authorities, Defendant's Motion for Summary Judgment (ECF No. 84) and Supplemental Memo (ECF No. 142) are denied.

## I. BACKGROUND

No new facts have been submitted with the subsequent briefing on the issue of qualified immunity; the parties' contentions in this respect rely solely on legal argument. I will therefore borrow the facts as laid out by the Eleventh Circuit when this case was on appeal, which took into account that for purposes of summary judgment review, "[I] must accept the facts as the plaintiff portrays them, to the extent that a reasonable jury could find that evidence in the record supports those alleged facts. [I] likewise must make 'all justifiable inferences' from the facts in the plaintiff's favor." *Rodriguez v. City of Doral*, 863 F.3d 1343, 1351 n.2 (11th Cir. 2017) (internal citations omitted).[1]

### A. The City of Doral

. . .

In 2007, Doral decided to create its own police department. Towards this end, it hired Ricardo Gomez as its first chief of police. Gomez served as the chief during the events that occurred in this case.

In order to gear up to become operational, the Doral Police Department needed to hire officers for its police force. So in January 2008, Doral offered and Plaintiff-Appellant Anthony Rodriguez accepted a position with Doral's Police Department. During his tenure with Doral, Rodriguez served as a detective.

At first, things at the Doral Police Department went along uneventfully for Rodriguez. But at some point during his service with Doral, Rodriguez began having difficulties with Gomez—difficulties that Rodriguez attributes to retaliation against Rodriguez for exercising his First Amendment rights.

### B. The Political Backdrop

Before discussing the nature of Rodriguez's problems with Gomez, we pause to provide some background on the alleged intrigue surrounding Doral's local politics and Rodriguez's involvement in them. Rodriguez first met Sandra Ruiz when he was employed as a police officer for the City of Hialeah. At the time, Ruiz was a member of the Doral City Council, and she encouraged Rodriguez to apply for employment with Doral. Before applying, though, Rodriguez decided to spend some time learning about how things operated in the City of Doral, so he began attending Doral City Council meetings. Over

---

[1] As noted by the Eleventh Circuit in its opinion, Defendants contest some of the facts set forth in this section. But, as noted above, I "must accept the facts as the plaintiff portrays them, to the extent that a reasonable jury could find that evidence in the record supports those alleged facts." *Rodriguez*, 863 F.3d at 1351 n.2.

time, he developed a friendship with Ruiz and would walk in public with her to her office.

During this period, Defendant-Appellee Juan Carlos Bermudez served as Doral's mayor. Rodriguez asserts that Bermudez and Ruiz were "political enemies." In support of this contention, Rodriguez notes that Ruiz is a Democrat, while Bermudez is a Republican. And when Ruiz ran for election to the State house and later for the Doral City Council, Bermudez supported her opponent on both occasions.

Returning to Rodriguez, after Rodriguez began to work for Doral, his friendship with Ruiz grew into a political affinity for her as well. As a result, Rodriguez volunteered his time for Ruiz and attended public and private gatherings with her or for her. He also educated her about issues of importance to law-enforcement officers and prepared her to speak informedly about law-enforcement matters at City Council meetings. Rodriguez did these things because he knew that Ruiz intended to run for mayor at some point, and he wanted to support her in that endeavor.

**C. The Alleged Plan to Target Rodriguez**

Not everyone appreciated Rodriguez's relationship with Ruiz. In fact, Rodriguez points to several pieces of evidence to show that Bermudez had a problem with Rodriguez because of Rodriguez's association with Ruiz.

First, Doral's city manager, Sergio Purrinos, informed Rodriguez that Bermudez had told Purrinos not to hire Rodriguez because Bermudez "did not want ... Ruiz having a friend in the police department."

Second, Doral Police Department Commander James Montgomery attested that he overheard a conversation between Bermudez and Gomez in which Bermudez said in a "very loud, very angry tone" that Gomez "needed to deal with this 'asshole Tony,' " or Bermudez would. When Montgomery asked Gomez about the conversation, Gomez said, "The Mayor wants me to get rid of somebody." So Montgomery asked Gomez whether grounds existed to terminate the employee, and Gomez responded, "Well it doesn't matter; I'll take care of the situation." In a different conversation between Montgomery and Gomez, Gomez told Montgomery that Bermudez and Gomez believed that Rodriguez "was passing information to a city council member." Based on these discussions, Montgomery warned Rodriguez that "he was being targeted."

Third, Rodriguez relies on information that Clemente Vera, a friend of Bermudez's, had given him. Vera told Rodriguez that Bermudez advised that he was "giving Tony a hard time because he's associated with Sandra Ruiz."

Fourth, Rodriguez recalled a conversation he had with Gomez during which Gomez referred to himself as "an evil person and that [Rodriguez] did not want to see the evil side of him." During this same discussion, Rodriguez said, Gomez warned Rodriguez, "It's your responsibility to be loyal to me and the mayor, and no one else." In addition, Gomez explained that Gomez did not want Rodriguez fired, but Bermudez did.

Fifth, Doral Police Department Lieutenant Alfaro opined to Rodriguez that "the targeting" was "because of [Rodriguez's] association with Sandra Ruiz."

3

And sixth, Doral Councilman Pete Cabrera advised Rodriguez of a conversation he had heard between Gomez and Bermudez. According to Cabrera's deposition testimony, the conversation occurred in July 2008, after Bermudez picked up Cabrera in his car. As Cabrera entered the car, he heard Bermudez having "a very loud, hostile phone conversation" with someone. Since Cabrera caught only the end of it, he asked Bermudez what the call was about. Bermudez explained that he was speaking with Gomez about Rodriguez, whom Bermudez described as "[Ruiz's] spy in the police department and ... the one that gets her all her information."

But Bermudez had a plan for dealing with the situation, Cabrera testified. He instructed Gomez that "[Gomez] better put an F ending to [Rodriguez] or [Bermudez] w[ould]." Then Bermudez continued, characterizing Ruiz as "an evil person" and vowing that if she ran for a higher office, "he would make it his personal mission in life to destroy her."

**D. The Alleged Targeting of Rodriguez**

As proof that the "targeting" was not just talk, Rodriguez relies on four incidents where he alleges he was, in fact, "targeted."

The first two incidents involve investigations that resulted in what Rodriguez describes as bogus disciplinary action against him. Of these, the first concerned Rodriguez's alleged unauthorized use of his police vehicle for personal business on the way home from work. At Gomez's direction, Rodriguez's direct supervisor, Sergeant George Gulla, investigated the incident to determine whether Rodriguez had violated City policy. Gulla determined that Gomez had authorized Rodriguez to stop at a fitness center on his way home and that Rodriguez had complied with Department policy by locking his weapons and other valuables in his police vehicle while he worked out.

Gomez did not agree with Gulla's conclusion. So he instructed Gulla to change the outcome of the report to find that Rodriguez had violated City policy. Against his will, Gulla did so. Rodriguez received written counseling as a result of the incident.

In his capacity as the Internal Affairs investigator, Gulla also conducted the second investigation. Rodriguez was accused of having used "improper procedure" by interfering with a Miami-Dade Police investigation. But after a "complete investigation," Gulla concluded that insufficient evidence existed to sustain the allegations against Rodriguez. So Gulla prepared a report to this effect and sent it to Gomez. But once again, Gomez took issue with Gulla's report and ordered Gulla to reverse his findings and find Rodriguez "guilty of some policy violation." And once again, against his will, Gulla did so.

The third alleged targeting incident concerned Rodriguez's December 2008 performance evaluation. Gulla attested that he prepared an evaluation that initially gave Rodriguez 38 or 39 points out of a possible score of 40. Before the evaluation became final, however, Gomez instructed Gulla to remove the narrative portion of the evaluation describing Rodriguez as "an asset" to the Doral Police Department and to lower Rodriguez's score to 34, which was the

> minimum score that would still allow Rodriguez to receive a raise. Gomez provided Gulla with no specific or objective justification for the changes.
>
> The <u>ultimate</u> alleged targeting incident occurred on January 29, 2009, when Rodriguez was instructed to go to Gomez's office. When Rodriguez arrived, Gomez, Gulla, and Alfaro were present. Gomez gave Rodriguez a letter terminating Rodriguez's employment "effective immediately." The letter offered no reason for the termination. And though Doral's human-resources director, Jorleen Aguiles, was copied on the letter, she declined to be involved in the termination process because Gomez refused to disclose to Aguiles any reason for Rodriguez's termination.
>
> Nor would Gomez give Rodriguez a reason for his termination when Rodriguez asked. Instead, Gomez said, "I don't have to give you a reason. This is an at-will police department. I didn't sign the termination letter; the city manager signed the letter."
>
> . . .
>
> Rodriguez attempted to appeal his termination under Doral's procedures. Though Rodriguez sent letters to Gulla, Gomez, and Soler-McKinley, Doral denied all requests to allow him to appeal the termination.

*Rodriguez* 863 F.3d at 1345–48 (emphasis added).

## II. LEGAL STANDARD

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56. In making this assessment, a court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.,* 894 F.2d 1555, 1558 (11th Cir. 1990).

## III. DISCUSSION

As an initial matter, Plaintiff argues that "the law of the case" prohibits Defendant Bermudez from raising qualified immunity at this point because the Eleventh Circuit already decided the issue by necessary implication when the case was on appeal. "Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a

5

later appeal." *This That And The Other Gift And Tobacco, Inc. v. Cobb Cty., Ga.*, 439 F.3d 1275, 1283 (11th Cir. 2006). However, the law of the case does not specifically foreclose Defendant Bermudez's qualified immunity argument here. It is not clear that the Eleventh Circuit had before it the issue of qualified immunity, and it did not reference the issue in its opinion. Therefore, the law of the case does not preclude Defendant Bermudez's current arguments.

Defendant Bermudez argues in his Supplemental Memo that Defendant Bermudez is entitled to qualified immunity on Plaintiff's claim that Defendant Bermudez violated his First Amendment right to political association. "Qualified immunity provides protection for government officials performing discretionary functions and sued in their individual capacities as long as their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights." *Gaines v. Wardynski*, 871 F.3d 1203, 1207 (11th Cir. 2017).

**A. Discretionary Function**

"Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." *Storck*, 354 F.3d at 1314. "Once this is accomplished, the burden shifts to the plaintiff to overcome the defense of qualified immunity." *Barnett v. MacArthur*, No. 16-17179, 2017 WL 4876289, at *9 (11th Cir. Oct. 30, 2017). "If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). While neither party specifically addresses the first prong of qualified immunity, Defendant Bermudez places significant emphasis on the fact that as the mayor of the City of Doral, he did not have the authority to fire Plaintiff. *See* Def. Bermudez's Statement of Material Facts ("Bermudez's SMF"), ECF No. 88, ¶ 11; Supp. Memo, 10–11, 15–16. As such, it becomes highly questionable whether Defendant was performing a discretionary function in allegedly orchestrating the firing of Plaintiff. However, because this argument is not fully fleshed out, I will not base my decision on it. It

6

is clear that Defendant Bermudez is not entitled to qualified immunity under the "clearly established law" prong.

### B. Clearly Established Law

Once it is determined that a public official was acting within his discretionary authority, "[t]raditional qualified immunity analysis then proceeds in two steps." *Barnett*, 2017 WL 4876289, at *9. The "initial task is to determine whether the officer's conduct violated a constitutional right, viewing the facts in the light most favorable to the plaintiff." *Id.* If that question is answered in the affirmative, the next inquiry is whether that right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

#### a. Violation of a Constitutional Right

Regarding the first step, the Eleventh Circuit has said in this case that "[t]o prevail on a First Amendment political-association claim, a plaintiff must show that (1) he engaged in constitutionally protected political affiliation or held constitutionally protected political beliefs, and (2) his protected conduct was a 'substantial or motivating factor' in the decision to take adverse action against the plaintiff." *Rodriguez*, 863 F.3d at 1350. In my Initial Order, I found that the first prong had been met for purposes of summary judgment, and the parties did not dispute that finding on appeal. *Id.* Nor do they dispute that finding now. Therefore, I must examine whether the facts, taken in the light most favorable to Plaintiff, establish that Plaintiff's protected conduct was a "substantial or motivating factor" in the decision to fire him. The Eleventh Circuit has noted "that the plaintiff's burden in this regard is not a heavy one." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000) (citing *Walker v. Schwalbe,* 112 F.3d 1127, 1131 (11th Cir.1997); *Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1564 (11th Cir.1995)). The inquiry is a fact-intensive one, conducted by examining the record and viewing it as a whole. *Id*. "'Purely circumstantial' evidence can satisfy the plaintiff's burden to show that the [protected conduct] caused the discipline." *Bybee v. Knight*, 2017 WL 385755, at *3 (M.D. Fla. Jan. 27, 2017) (citing *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564–65 (11th Cir. 1995)).

Here, the facts, taken in the light most favorable to Plaintiff, could allow a reasonable juror to find that Defendant Bermudez used his influence as mayor to have Plaintiff fired

because of Plaintiff's political association with Defendant Bermudez's rival. Despite Defendant Bermudez's contention that the "only evidence [Plaintiff] has presented of an act by [Defendant] Bermudez is a single statement by [Defendant] Bermudez 'If you don't fire that asshole Tony, I will,'" Supp. Memo, 11, such a reading of the evidence is, in reality, a reading in the light most favorable to *Defendant Bermudez*. As the Eleventh Circuit has shown in its description of the facts, there is ample evidence in the record to draw an inference in Plaintiff's favor. The Eleventh Circuit noted six separate instances where Plaintiff established that Defendants had a plan to target him for his political association. *See* Sect. I, *supra*. These include Defendant Bermudez's comment that he "did not want . . . [Councilwoman] Ruiz having a friend in the police department;" Police Chief Gomez's statement that "The Mayor wants me to get rid of somebody," and that he would "take care of the situation;" Defendant Bermudez's friend stating Defendant Bermudez was giving Plaintiff a hard time "because he's associated with [Councilwoman] Ruiz;" Police Chief Gomez stating Defendant Bermudez wanted Plaintiff fired; Police Lieutenant Alfaro opining that Plaintiff was being targeted because of his association with Councilwoman Ruiz; and Defendant Bermudez saying "[Police Chief Gomez] better put an F ending to [Plaintiff] or [Defendant Bermudez] w[ould]." *Rodriguez*, 863 F.3d at 1346–47. Defendant Bermudez ignores this testimonial and circumstantial evidence which, when viewed as a whole, amounts to much more than a "single statement."

Defendant Bermudez next claims the fact that Plaintiff was an at-will employee means he could have been terminated for no reason at all. In addition, Defendant Bermudez claims Plaintiff also could have been fired for his poor judgment on two occasions, which resulted in two internal investigations into Plaintiff's conduct. However, viewed in the light most favorable to Plaintiff, a reasonable juror could find that these investigations were only begun and concluded against Plaintiff because it was part of Police Chief Gomez and Defendant Bermudez's "plan" to "get rid of" Plaintiff for his association with Councilwoman Ruiz. To bolster such an inference, neither of these reasons were given upon Plaintiff's termination—and the City's Human Resources manager specifically declined to be involved in the termination process *because* no reason was given. While these facts may be contested and other inferences may be drawn from them, the record, viewed in its entirety and in the light most favorable to *Plaintiff*, could allow a jury to find that Defendant

Bermudez was substantially motivated to have Plaintiff terminated specifically because of Plaintiff's political association. Clearly, whether Plaintiff's protected conduct was a "substantial or motivating factor" in the decision to take adverse action against Plaintiff is a question best suited for a jury.

### b. Fair Warning

The next inquiry is whether the law was clearly established in light of the particular circumstances of this case. *Gaines*, 871 F.3d at 1208. "When we consider whether the law clearly established the relevant conduct as a constitutional violation at the time that Defendant . . . engaged in the challenged acts, we look for 'fair warning' to officers that the conduct at issue violated a constitutional right." *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) (citing *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) (citations and quotation marks omitted)). In this vein, Defendant Bermudez claims that four cases decided since the date of my Initial Order now clarify the law and mandate that Defendant Bermudez is entitled to qualified immunity because Plaintiff has not defined his constitutional right at a sufficient level of particularity. These cases are *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015), *White v. Pauly*, 137 S. Ct. 548 (2017), *Gaines v. Wardynski*, 871 F.3d 1203 (11th Cir. 2017), and *District of Columbia v. Wesby*, No. 15-1485, 583 U.S. __ (Jan. 22, 2018). *Sheehan* deals with qualified immunity in the context of police officers entering a home without a warrant. *Sheehan*, 135 S. Ct. 1765. *Pauly* discusses qualified immunity in the context of police officers using excessive force. *Pauly*, 137 S. Ct. 548. The recent decision in *Wesby* has to do with qualified immunity in the context of whether police officers had probable cause to arrest. *Wesby*, No. 15-1485, 583 U.S. __. Defendant Bermudez cites these three cases as standing for the ordinary proposition that "'clearly established law' should not be defined 'at a high level of generality'" and that "clearly established law must be 'particularized' to the facts of the case." *Pauly*, 137 S. Ct. at 552. *See also Sheehan*, 135 S. Ct. at 1776 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *Wesby*, No. 15-1485, 583 U.S. __, at 14 ("We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she

9

faced.") (internal quotations omitted). However, these three cases involve qualified immunity in the Fourth Amendment context, not the First Amendment context. The Fourth Amendment qualified immunity analysis generally involves a reasonableness standard that takes into account "the fact that police officers are often forced to make split-second judgments." *Sheehan*, 135 S.Ct. at 1775 (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014)).

Allowing for such split-second judgments is not a consideration in a First Amendment political association claim. "[F]reedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Elrod v. Burns*, 427 U.S. 347, 357 (1976). The analysis in this context therefore involves balancing different factors than with a Fourth Amendment claim. *See id.* at 363. "[C]onditioning the retention of public employment on the employee's support of the in-party . . . must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id.* "Conditioning employment on political patronage, however, may be constitutionally acceptable if the 'hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Brett v. Jefferson Cty., Ga.*, 123 F.3d 1429, 1433 (11th Cir. 1997) (quoting *Branti v. Finkel,* 445 U.S. 507, 518 (1980)). This balancing test has become known as the *Elrod-Branti* test. *Id.* "Here, [however,] whether [Plaintiff's] political beliefs or his party affiliation is 'an appropriate requirement for the effective performance' of [Plaintiff's] duties is not at issue; the parties agree that these considerations are irrelevant to Rodriguez's ability to properly execute his responsibilities as a Doral police detective." *Rodriguez*, 863 F.3d at 1350.

Under this framework, I must now review *Gaines* to determine whether it requires a higher level of specificity in the First Amendment context such that Defendant Bermudez did not have fair warning that his actions were violating Plaintiff's constitutional right to freedom of association. As *Gaines* illustrates, there are three ways a plaintiff can show a government official had fair warning: 1) a materially similar case has been decided; 2) a broader, clearly established principal exists that would control the novel facts of a given

situation; and 3) the conduct involved may "so obviously" violate the constitution that prior case law is unnecessary. *Gaines*, 871 F.3d at 1208 (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012)). The second and third methods are known as "obvious clarity" cases. *Id.* "They exist where the words of the federal statute or constitutional provision at issue are 'so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful,' or where the case law that does exist is so clear and broad (and 'not tied to particularized facts') that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *Id.* at 1209. Plaintiff contends that Defendant Bermudez's actions fall into all three categories. Defendant Bermudez, of course, argues that his behavior falls into none of these categories. I am more inclined to agree with Plaintiff, and find that, taking the facts in the light most favorable to Plaintiff, Defendant Bermudez's conduct satisfies at least the second test.

Defendant argues that *Gaines* is particularly instructive and applicable here because it analyzed a First Amendment claim under a freedom of speech and freedom of association context. *Gaines* involved a public school teacher who applied for a promotion but was purportedly denied the promotion based on the political speech of her father. *Id*. at 1207. Gaines alleged Dr. Wardynski violated her right to freedom of speech (based on the speech of her father) and freedom of intimate association (based on her close relationship with her father). *Id.* The Eleventh Circuit overturned the district court's denial of qualified immunity on the grounds that "the case law that Gaines has relied upon was not particularized to the facts of the case, but rather it merely set out First Amendment principles at a high level of generality[ such that] it was not 'apparent' that passing her over for promotion based on things her father said would violate *her* constitutional rights." *Id.* at 1214.

The issue presented here is starkly different. First, the right allegedly violated here is the right to *political* association, not intimate association. Where political association is infringed by an adverse employment action, the *Elrod-Branti* test applies. *See Brett*, 1223 F.3d at 1433. "The *Elrod–Branti* test, however, 'does not require open-ended inquiries into specific work-place relationships . . . because the public employee's interests and the public employer's interests are essentially fixed and unvarying in the raw political patronage context." *Brett*, 123 F.3d at 1433 (quoting *Stough v. Gallagher,* 967 F.2d 1523, 1527 (11th Cir.

1992)). "Under our sustained precedent, conditioning hiring [and firing] decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 78 (1990). Where, as here, it has already been determined that political patronage is not an essential part of Plaintiff's job, there is little specificity needed beyond the fact "that a government may not fire a public employee solely because of his political association or beliefs." *Rodriguez*, 863 at 1350.

The level of specificity propounded by Defendant Bermudez is unwarranted where there is a clear rule that encompasses Defendant's conduct. Even *Gaines*, which Defendant himself cites, recognizes there exist cases of "obvious clarity" where a Defendant would not need a virtually identical factual scenario to put him on notice that his actions were unconstitutional. For example, the *Gaines* court noted the Eleventh Circuit has "held that the general principle against warrantless searches and seizures established in a variety of cases was enough to clearly establish that a warrantless entry into a doctor's office to look for a probationer was unconstitutional." *Id.* at 1213 n.4 (citing *O'Rourke v. Hayes*, 378 F.3d 1201, 1208 (11th Cir. 2004)). The *Gaines* court noted that in *O'Rourke*, "Hayes did not have a search warrant, and can point to no exigency justifying his search. Consequently, even if a factually similar case did not exist, his actions would still have violated rights that are clearly established under these general statements of principle." *Id.* (quoting *O'Rourke*, 378 F.3d at 1208). Such is the case here. Even if there is no Supreme Court, Eleventh Circuit, or Florida Supreme Court case that established that a "weak mayor with no legal ability to hire or fire any city employee stated to the city's Chief of Police (who also did not have authority to hire or fire any city employee) 'if you don't fire [the Plaintiff, an employee in the city Police Department], I will,'" Supp. Memo, 16, was impermissible, the bright line rule that a government may not fire a public employee solely because of his political association or beliefs is sufficiently clear to put Defendant Bermudez on notice that using his influence to have Plaintiff fired is unconstitutional. In addition, Defendant Bermudez's overly narrow description of his actions ignores the fact that the evidence at this stage must be taken in the light most favorable to Plaintiff, and viewing the evidence in that light suggests much more than a single statement. Further, as discussed briefly above, the fact that Defendant Bermudez had no ability to hire or fire any city employee also calls into question whether

Defendant Bermudez was even acting within his discretionary authority as mayor for qualified immunity to attach. Defendant Bermudez's ultimate argument seems to be that simply because he was not the person who fired Plaintiff, he cannot be held accountable for any efforts to get Plaintiff fired for his association with a "political rival." It is possible that the facts as shown may lead a jury to conclude that Defendant Bermudez did not play a role in Plaintiff's firing or that Plaintiff's political association was not a substantial factor in his firing; however, Plaintiff has brought forth sufficient facts for a jury to conclude that Defendant played a role in Plaintiff's firing and that it was politically motivated. Viewed in this manner, any reasonable government official would have known that a politically motivated firing would be unconstitutional.

### IV. CONCLUSION

Accordingly, it is **ORDERED and ADJUDGED** that Defendant Bermudez's Motion for Summary Judgment ("Motion") (ECF No. 84) and Supplemental Memo (ECF No. 142) are **DENIED**.

**DONE and ORDERED** in chambers at Miami, Florida, this 30th day of January 2018.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*